Gores vs. Graff.

GORES, Administrator, Respondent, vs. GRAFF, Appellant.

*May 22 — June 21, 1890.*

*Physicians and surgeons: Action to recover for death of patient: Proximate cause: Preponderance of evidence: Instructions to jury: Damages.*

1. In an action against a surgeon to recover damages for the death of a person, alleged to have been caused by the defendant's failure to treat him properly, there can be no recovery unless it is proved sufficiently to bring conviction to a reasonable mind, without resorting to mere conjectures or uncertain and inconclusive inferences or bare probabilities, that the defendant's failure in his duty was the proximate cause of the death.

2. The jury should not be instructed that if there is a preponderance of evidence tending to prove the facts essential to a recovery they should find for the plaintiff. The instruction should be that if the jury are satisfied from a preponderance of the evidence that all such facts have been proved they should find for the plaintiff; otherwise, for the defendant.

3. Since the amount recovered in an action for the death of a person belongs to the relatives specified in sec. 4256, R. S., the jury should not be instructed to give damages to recompense the *estate* of the deceased.

APPEAL from the Circuit Court for *Eau Claire* County.

The defendant is a physician and surgeon, and was employed to treat a wound received by the plaintiff's intestate, Hakon Oleson, who afterwards died from the effects thereof. This action was brought under sec. 4255, R. S., to recover damages for the death of Oleson, alleged to have been caused by the unskilful and negligent treatment of the wound by the defendant.

On March 12, 1887, the plaintiff's intestate was engaged with another in splitting a log, when the axe of his fellow-workman flew off the handle, and the edge of the axe struck Oleson a little above the right knee, inflicting a wound from one and a half to two inches in length. The testimony tends to show that the axe penetrated the knee-

·joint through the membranes covering it. Oleson resided in Eau Claire, and when injured was at work in the woods some distance from his home. His fellow-workman inserted chewed tobacco quids in the wound, bound it up, and took him in a sleigh to Arcadia, the nearest railroad point, about eighteen miles distant. He was then brought on a train to Eau Claire, and taken to his home, reaching there the next morning. Whether the tobacco quids were removed before he left the woods, or remained in the wound until he reached his home, and whether the wound was bandaged with filthy or clean cloths, are disputed questions in the case.

On the arrival of Oleson at his home, *Dr. Graff*, the defendant, was called to treat him, and first saw him towards noon of that day. He applied what is called the antiseptic treatment, which it is not denied was correct practice, and dressed the wound properly. He called to see Oleson the next day, but did not remove the bandages. He next visited him March 19th, removed the bandages, and examined and dressed the wound. Up to this time it is not seriously controverted that the treatment was in strict accordance with the approved rules of surgery. He informed Oleson's wife that he would not call again until March 27th, unless Oleson grew worse, in which case he left a request that he be sent for.

The wound commenced growing worse soon after March 19th, and developed much inflammation, causing great pain. The testimony tends to show that *Dr. Graff* was sent for March 25th, and informed of Oleson's condition, but did not visit him again until March 27th. He then found Oleson in a very bad condition. The limb was much swollen, discharging large quantities of pus, and the patient was suffering intense pain. He again examined and dressed the wound, putting in proper tubes for the discharge of the pus. The testimony tends to show that on this occasion he flexed the limb with violence, causing the patient intense

pain.  He visited the patient, successively, on March 31st and April 2d, 5th, and 8th, pursuing the same general treatment.  On April 9th Dr. Christensen was called in. He removed the bandages, examined the limb somewhat, and then restored the bandages, but did nothing further. He declined to take the case until he could advise with another physician, and until *Dr. Graff* should be dismissed. *Dr. Graff* was thereupon dismissed, and on the next day Dr. Christensen, accompanied by Dr. Day, made an examination of the wound.  They became satisfied that in order to save Oleson's life it would be necessary to amputate the limb, but that such was his condition this could not be done without fatal results, until he could be strengthened.  Dr. Christensen thereupon took charge of him, and by tonic treatment succeeded in improving his condition, so that on April 29th the limb was successfully amputated without any very serious shock to the patient.  From that time until his death he was under the care of Dr. Pinkerton, the city and county physician.  He continued to improve for several weeks after the amputation, and Dr. Pinkerton thought he might recover.  Then his symptoms took an unfavorable turn, and he continued to grow worse, until he died from exhaustion on August 12, 1887.

A trial of the action resulted in a verdict for the plaintiff, assessing damages at $2,500.  A motion for a new trial was denied.  The case is further stated in the opinion. Judgment was rendered pursuant to the verdict.  The defendant appeals from such judgment.

*W. F. Bailey*, for the appellant.

*T. F. Frawley*, for the respondent.

Lyon, J.  We have reached the conclusion that the judgment in this case must be reversed for material errors in the instructions given by the learned circuit judge to the jury.  But, before proceeding to the consideration of such

instructions, it seems necessary to make a few general observations upon the testimony in the case bearing upon them.

We do not say that the testimony is insufficient to support the judgment, but should say that, after a most careful consideration thereof, we are impressed with the thought, or at least the fear, that too much of mere conjecture has entered into the verdict. Undoubtedly the testimony is sufficient to support a finding that by his failure to visit Oleson more frequently *Dr. Graff* failed to perform his duty to his patient. In view of the result, *Dr. Graff* frankly admits that it would have been better had he seen the patient at shorter intervals. Then the manner in which he treated the limb on March 27th, if such treatment is correctly stated by plaintiff's witnesses, was certainly bad surgery, and may have led to serious consequences. However, if *Dr. Graff's* testimony on that subject be taken as true,— if he flexed the limb carefully and gently for the purpose of causing the pus to discharge from the wound,— the medical testimony satisfactorily shows that it was proper practice. But it was competent for the jury to discredit his testimony, and accept as true that of the plaintiff's witnesses. Hence, had Oleson lived and brought an action for malpractice against *Dr. Graff*, we should probably have to hold that a verdict, based on the same testimony we have before us, would be supported by the proofs.

This is not an action to recover damages for malpractice, in which the plaintiff would be entitled to recover if he established the fact that the surgeon failed in his duty, to the injury of the patient; but it is an action under the statute (R. S. sec. 4255), in which there can be no recovery unless the plaintiff has proved that the failure of *Dr. Graff* to perform his professional duty was the direct cause of the death of Oleson. If there was any intervening cause, in the absence of which it is reasonably probable that Oleson

would not have died, the action cannot be maintained. There can be no recovery unless it is reasonably probable that Oleson would have lived had *Dr. Graff* treated him properly, and the existence of such reasonable probability must be proved; that is to say, facts and circumstances must be proved sufficient to bring conviction to a reasonable mind, without resorting to mere conjecture or uncertain and inconclusive inferences or bare probabilities, that the surgeon's neglect of his duty was the proximate cause of the death of his patient. The sad thought "it might have been" forces itself upon all in hours of sorrow and gloom; but, unless the thought is verified by substantial and reasonably conclusive proof, it furnishes no safe basis of judicial judgment.

It is a frequent occurrence that patients change physicians; also, that the second physician called disapproves the treatment of his predecessor, and changes it (perhaps properly), and the patient dies. In such a case, if it should appear that the practice of the physician first called was incorrect, there is always room to conjecture that, had the patient been properly treated in the first instance, he would not have died. And yet, if a verdict based upon mere conjecture could be sustained, holding the physician first employed guilty of causing the death of the patient, the practice of medicine and surgery would be most perilous callings. The law does not subject the members of those or any other professions to any such peril.

Although the breach of his duty by *Dr. Graff* might have been a remote cause of the death of Oleson, the testimony tends to show the existence of other and more proximate causes of his death. Thus, it shows that the wound was a very dangerous one if it penetrated the knee joint, and tends to show that it did penetrate that joint. It also shows that the wound was dressed in the first instance by applying to it chewed quids of tobacco, and tends to show

that it was bandaged with filthy rags, which, with the tobacco, remained on it until *Dr. Graff* dressed it, the next day after it was inflicted. All the medical witnesses agree that this was bad practice and increased the danger of disastrous results. The testimony also shows that Dr. Christensen, when he first saw Oleson, unbandaged the wound, but did not dress it, and left it wrapped in the bandages he found on it, which were saturated with an offensive discharge from the wound. The experts seem to agree that this was bad surgery. Moreover, it appears that the surroundings of Oleson were unfavorable to his recovery. He was poor, and the attendance, appliances, and food essential to secure his recovery were not within his reach. Considering these and other adverse circumstances, all beyond the control of *Dr. Graff*, in connection with the facts that the wound was properly treated by *Dr. Graff*, and the patient did well until after March 19th; that his general health improved under the treatment of Dr. Christensen so that the amputation was performed successfully on April 29th without any undue shock to the patient; that his symptoms were favorable, and he continued steadily to improve for several weeks thereafter before they took an unfavorable turn; and that he lived more than four months after *Dr. Graff* ceased to treat him,— it must be conceded, we think, that there is considerable room to doubt whether the evidence shows with sufficient certainty that the alleged neglect and wrong treatment of the wound by *Dr. Graff* was the direct cause of the death of Oleson.

In view of the above considerations, the following instruction given to the jury is a very important one: " This case should be decided upon a preponderance of evidence. It is not necessary that any fact should be proved beyond a reasonable doubt, much less to an absolute certainty. Such a degree of proof would be impossible in any case, and especially in a case like this, where so much depends upon the

judgment of experts and is a matter of opinion only; hence the law does not require absolute certainty, but there must be only a fair preponderance of evidence tending to show the existence of any fact necessary to be proven as a condition of recovery, or as a fact relied upon to establish a defense."

The substance of the instruction is that, if there was a preponderance of evidence tending to prove a fact essential to a recovery in the action, the verdict should be for the plaintiff. This was manifest error. The instruction should have been that, if the jury were satisfied by a preponderance of evidence that all the facts essential to a recovery were proved, they should find for the plaintiff. Failing such proof, their verdict should be for the defendant. There may have been a preponderance of evidence tending to prove such facts, or some or all of them, and yet the evidence be quite insufficient to prove those facts. For example, the evidence tends to prove that the fatal blood poisoning and consequent death of Oleson was caused directly by bad surgery and neglect on the part of *Dr. Graff*. Under this instruction, if the jury were of the opinion that such evidence preponderated over that which tended to show the contrary, it was their duty to find for the plaintiff, although they might also have been of the opinion (had the question been submitted to them) that the testimony was not sufficient to establish such fact. In a case in which the facts are more clearly proved, such an error might be less significant; but when, as in the present case, it is very doubtful whether the facts essential to a recovery are proved, the error is a vital one, and necessarily fatal to the judgment. The case of *Dunbar v. McGill*, 64 Mich. 676, is in point. The ownership of a lot of sheep was there in question. The court submitted this question to the jury: "Is there more evidence to show that these were Mr. Dunbar's sheep than that they were not his sheep?" For reasons similar to

those above suggested, this was held to be erroneous, and the judgment was reversed.

On the subject of damages the jury were instructed: "If you find for plaintiff, you will allow as damages such sum as you deem reasonable to recompense the *estate* of deceased for the death of Oleson, taking into consideration his age, health, and ability to earn money for the support of himself and family." This instruction is also erroneous. Under sec. 4256, R. S., the widow alone is entitled to the damages recovered in this action. The *estate* of the deceased belongs to his widow and children, of whom two survived him. By directing the jury to give damages to recompense the estate of the deceased, the court, in effect, instructed them that they might give damages for the injury sustained in his death by his children as well as his widow. This was error, and, because the instruction would almost necessarily increase the damages, the error is material. This has already been ruled, substantially, by this court in the cases of *Woodward v. C. & N W. R. Co.* 23 Wis. 404; *Schadewald v. M., L. S. & W. R. Co.* 55 Wis. 574; and *Kreuziger v. C. & N. W. R. Co.* 73 Wis. 162,— cited in the brief of counsel for the defendant. The question is sufficiently discussed in those cases, and nothing need be added to what is there said.

*By the Court.*— The judgment of the circuit court is reversed, and the cause will be remanded for a new trial.